UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
(at Lexington)

| | | |
|---|---|---|
| JOSEPH BOGGS, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 5: 24-136-DCR |
| | ) | |
| V. | ) | |
| | ) | |
| BOARD OF EDUCATION OF | ) | **MEMORANDUM OPINION** |
| FAYETTE COUNTY, KENTUCKY, | ) | **AND ORDER** |
| et al., | ) | |
| | ) | |
| Defendants. | ) | |

*** *** *** ***

This matter is pending for consideration of Plaintiff Joseph Boggs' ("Boggs") petition for judicial review of the Exceptional Children's Appeal Board's ("ECAB") decision rejecting his claim that he was not afforded a free appropriate public education ("FAPE"). Boggs' motion to overrule the ECAB's decision [Record No. 22] will be denied and the ECAB's holding in favor of Defendant Board of Education of Fayette County, Kentucky (the "Board") will be affirmed.[1]

---

[1] Defendant Kentucky Department of Education states in its Response to Plaintiff's Principal Brief [Record No. 25] that "all parties [have] agreed that 'the Department is named as a party solely to effectuate the implementation of any order by this Court which might direct further administrative activity, that the Department is not a real party in interest, and that the Department need not participate in any briefing activity." Based on these representations, no relief will be accorded to Defendant Kentucky Department of Education.

- 1 -

## I. Facts

Boggs was born with visual and hearing impairments stemming from a diagnosis of peroxisomal biogenesis disorder ("PBD"). [2] [AR, p. 246] Consequently, Boggs was considered "deaf-blind." [*Id.* at 258] From age 5, he attended various schools within the Fayette County system from the elementary level through high school. [*Id.* at 208] According to Boggs' mother, the child excelled at the elementary and middle school levels and continued to perform well in school his first two years at Tate's Creek High School. [*Id.* at 208]

On November 25, 2015, Boggs was involved in a severe automobile accident. While sitting in the backseat, Boggs' car was "t-boned" by another vehicle and, according to his mother, Boggs was knocked unconscious. [*Id.* at 260-261] Boggs alleges that this resulted in a traumatic brain injury ("TBI") but he has not provided any documentation to support an *official* diagnosis of that condition. [*Id.* at 330-332]

Following the accident, Boggs was homeschooled for a brief period, but returned to school in January 2016 for the second semester of his second year of high school. [*Id.* at 208] Boggs alleges that the accident led to adverse behavioral changes and impeded his ability to learn in accordance with his previous efficacy. [*See id.* at 167 ("When Joseph returned to TCHS, he was a different student. Joseph went from receiving passing grades to failing his classes. Prior to the accident, Joseph did not have a history of behavioral issues.").] Further,

---

[2]   The undersigned "is required to make findings of fact based on a preponderance of the evidence contained in the complete record, while giving some deference to the fact findings of the administrative proceedings." *Knable ex rel. Knable v. Bexley City Sch. Dist.*, 238 F.3d 755, 764 (6th Cir. 2001). Citations to the administrative record in the case contained in Record Nos. 15-1, 15-2, 15-3, and 19-1 will be denoted as "AR".

Boggs' grades declined, and he began failing more classes. [*Id.*] But Boggs does not provide evidence of any disciplinary problems until almost a year after the car crash.

On October 24, 2016, Boggs was involved in a minor disciplinary incident. [*Id.* at 399] As Boggs was walking down a school hallway into an area that was restricted for students, a security guard yelled for him to stop. However, due to Boggs' impairments, he did not realize he was entering a restricted area, nor that the guard was directing him to stop. [*Id.* at 215-216] The guard grabbed Boggs' shoulder, and told him to "stop." [*Id.* at 216]  A startled Boggs responded, "don't touch me or I'll sue you." But the officer believed that Boggs' responded that he would "shoot" instead of "sue" the officer. [*Id.*]  It does not appear that Boggs was directly disciplined for the incident. However, at some point thereafter, staff began searching Boggs' bag and conducting physical searches of his person each morning. This first occurred with other students present, but the searches were later performed in a more private setting. [*Id.* at 216 and 266] According to Boggs' mother, the searches made Boggs more anxious and hindered his ability to make friends. [*Id.* at 267]

Although Boggs' mother asserts that Boggs' continued to suffer from a TBI, but until May 2018 (nearly two and a half years after the November 2015 crash), Boggs provides no further records of disciplinary actions ostensibly attributable to the car accident.  On May 8, 2018, and after the bell for the first period class had rung, Boggs walked past associate principal Cheatham, giving him the middle finger. [*Id.* at 216] Principal Mills later located Boggs, attempted to stop him, and asked Boggs to come into his office.  Instead, Boggs raised his voice and ran out of the building. [*Id.* at 216-217]  Once outside, Boggs sat on a curb and took off his pants. [*Id.* at 217] He then entered the middle school that he had previously attended.  Boggs was referred to a counselor because of the incident and issued a civility letter,

"to remind him of behavior expectations and maintaining appropriate communications with staff." [*Id.* at 828] Boggs' mother described the incident as very uncharacteristic. [*Id.* at 407]

Between 12:00 a.m. and 9:00 a.m. on May 9, 2018, Boggs left five voicemail messages on multiple school extensions. [*Id.* at 217] While Boggs' mother attempted to characterize the messages as an apology to Cheatham, they cannot reasonably be interpreted as such. [*Contra id.* at 286.] In each voicemail, Boggs states "Mr. Cheatham, kiss my ass you son of a bitch, go to hell, Mr. Cheatham." [*Id.*]

In a voicemail left to the principal's administrative assistant, Boggs stated, "if I had a *twenty* yesterday, things would be different for Mr. Cheatham. I've got friends down in Texas that will take care of you. You better watch it, buddy. You better get rid of that civility letter." Boggs then began laughing as he ended the voicemail. [*Id.* at 217 and 389] Boggs' mother disputes that he stated "twenty," claiming that Boggs uttered "twin" instead. She further asserted than Boggs' friend in Austin, Texas was an individual who "helps people with disabilities with law." Thus, his voicemails were not intended to be threatening. [*Id.* at 416] The school, however, interpreted "twenty" to refer to a firearm, and suspended Boggs for 10 days because his message was reasonably perceived as a physical threat towards Cheatham. [*Id.* at 845]

A meeting intended to determine whether Boggs' actions were a manifestation of his disabilities was scheduled for May 15, 2018, then rescheduled to May 21, 2018. [*Id.* at 385-386] A copy of Boggs' parents' rights regarding the meeting was mailed to the Boggs' home in addition to notices of the meeting. [*Id.* at 220] Meeting notices were mailed May 11, 2018, and May 14, 2018, and email notices were sent on May 11, 2018, May 14, 2018, May 16, 2018, and May 21, 2018. [*Id.*] The digital notices were not emailed in the 16-point font Boggs

was accustomed to reading, but he had the ability to enlarge it on his iPad or other devices. [*Id.*] According to Boggs' mother, her son's iPad, laptop computer, and iPhone were all broken, so Boggs had no way of viewing and enlarging the notices. [*Id.* at 377] The emails were also sent to Boggs' mother, but she alleged she no longer had access to the email. [*Id.* at 384] Physical letters sent to Boggs were not in the larger font, and his parents state that they did not open the letters regarding the meeting. [*Id.* at 421-422]

Neither Boggs nor his parents attended the meeting on May 21, 2018. During the meeting, Dr. Erin Seale, Boggs' achievement and compliance coach, determined that Boggs' behavior was not a manifestation of his disability. Thereafter, Boggs was transferred to Martin Luther King Academy, an alternative high school which included students with behavioral problems. [*Id.* at 218] Boggs began a fifth year of high school at Martin Luther King in August 2018. [*Id.* at 221] "While at MLK, Joseph was given a battery of tests in academic areas that he was deficient for graduation credit. The tests were administered through a computer system 'PLATO.'" [Record No. 22, p. 4] Boggs "was able to complete academic courses with passing grades sufficient to graduate in all the necessary subjects in only three school days." [*Id.*] Boggs graduated on August 23, 2018. [AR, p. 221]

## II. Procedural Background

Boggs first requested an administrative due process hearing on December 26, 2018. [*Id.* at 1] He raised issues concerning his right to a FAPE under the Individuals with Disabilities Education Act ("IDEA"). "Through extensive pre-hearing motion practice, the issues to be addressed at the hearing were amended, supplemented, and modified, and eventually memorialized by the Hearing Officer in a series of prehearing orders." [Record No. 23, p. 5 (*citing* AR, pp. 133, 2367, and 153).] From September 26 to September 29, 2022, a hearing

Case: 5:24-cv-00136-DCR   Doc #: 27   Filed: 06/30/25   Page: 6 of 15 - Page ID#: 2646

was held regarding Boggs' claims. The parties submitted written briefs to the hearing officer thereafter. On September 14, 2023, the officer issued a decision denying Boggs all relief requested except 27 hours of night-time orientation and mobility services owed to Boggs by the Board's stipulation. [AR, p. 201]

Boggs appealed the decision to the ECAB, and the matter was fully briefed. [*See id.*, pp. 2273, 2296, and 2289] On March 11, 2024, the ECAB issued a written opinion affirming the findings of the hearing officer. [*Id.* at 2323] Boggs filed a Complaint for review in Fayette Circuit Court on May 9, 2024, and the case was removed to this Court on May 20, 2024. [Record No. 1]

### III.  Legal Standard

The IDEA requires recipients of federal funds to provide a FAPE to children with disabilities. *See* 20 U.S.C. § 1412(a)(1) (2012). This guarantee is protected with certain procedural safeguards. *Id.* § 1415. Parties may present a complaint concerning the provision of FAPE, *id.* § 1415(a)(6), and may be entitled to a "due process hearing" before an impartial hearing officer. *Id.* § 1415(f). A party aggrieved by the result of an IDEA due process hearing may appeal the result to the state educational agency. *Id.* § 1415(g). The outcome of the administrative review hearing may then be challenged in district court. *Id.* § 1415(i)(2).

"District courts review IDEA cases under a modified de novo standard." *Ja. B. v. Wilson Cnty. Bd. of Educ.*, 61 F.4th 494, 502 (6th Cir. 2023) (citing *Bd. of Educ. of Fayette Cnty. v. L.M.*, 478 F.3d 307, 313 (6th Cir. 2007)) (citation modified). The undersigned will "set aside administrative findings only if the evidence presented 'is more likely than not to preclude the administrative decision from being justified based on the agency's presumed educational expertise, a fair estimate of the worth of the testimony, or both.'" *Id.* (quoting

*L.M.*, 478 F.3d at 313). "More weight is due to an agency's determinations on matters for which educational expertise is relevant." *L.M.*, 478 F.3d at 313 (quoting *Deal v. Hamilton Cnty. Bd. of Educ.,* 392 F.3d 840, 849 (6th Cir. 2004)) (citation modified). Finally, this Court "is required to make findings of fact based on a preponderance of the evidence contained in the complete record, while giving some deference to the fact findings of the administrative proceedings." *Knable ex rel. Knable v. Bexley City Sch. Dist.*, 238 F.3d 755, 764 (6th Cir. 2001).

### IV. Analysis

"A school district may be held liable for procedural violations of the IDEA that cause substantive harm to the student." *L.M.*, 478 F.3d at 313 (citing *Metro. Bd. of Pub. Ed. v. Guest,* 193 F.3d 457, 464 (6th Cir. 1999)). In arguing he was denied a FAPE, Boggs challenges three parts of the ECAB's holding. Boggs claims that: (1) he was not provided adequate orientation and mobility services; (2) the school failed to adequately conduct a manifestation determination in his Admission and Release Committee ("ARC") hearing; and (3) the Board failed to provide him with transition services. Each claim is address below.[3]

#### A. Orientation and Mobility Services

Boggs contention that the Board failed to equip him with a FAPE because he was not provided with sufficient orientation and mobility services is contradicted by the record.

---

[3] Throughout his brief, Boggs cites to multiple cases published under the Individuals with Disabilities Law Reporter ("IDELR") without attaching the cases to his briefs. Local Rule 7.1(h) provides "[i]f a motion, response, or reply contains a citation to any authority not available electronically, a copy of the authority must be attached." To avoid prejudice to the Board, the undersigned will only consider the Hawaii case published at 52 IDELR 58, because it is attached to his principal brief. The other case (45 IDELR 188) Boggs attached to his reply will not be considered because the Board had no opportunity to address it in its response.

Initially, Boggs challenges the Board's provision of night-time orientation and mobility services despite the Board's stipulation it owed Boggs 27 hours.  Boggs asserts the following:

> Ms. Seale stated in the Plaintiff's ARC meeting held on January 30, 2018 that the Plaintiff was owed over 180 minutes in August, 2017, 260 minutes in September, 2017, 260 minutes in October, 2017, 260 in November, 2017, 180 minutes in December, 2017, 270 minutes in January, 2018.  The Defendant never explained how the hours Seale stated *were reduced to only 27 hours*.

[Record No. 22, p. 8 (emphasis added).]  However, as the Board notes, the night-time orientation and mobility minutes Boggs lists above only add up to 23.5 hours.  The proper figures, which add up to the stipulated 27 hours, are listed in the ARC meeting notes in the administrative record.  [*See* AR, p. 2042]  Based on these allegations, and Boggs' mathematical error, it does not appear that the night-time orientation hours were reduced at all.

Boggs also alleges that he "needed additional instructions in orientation and mobility ni [sic] order to adequately navigate his community" and "the Defendant intermittently failed to provide day orientation and mobility services."  But he provides no evidence to reinforce his claims concerning a lack of day-time orientation and mobility services.  Further, even if he could prove the day-time services were inadequate, procedural defects must lead to concrete and substantive harm to warrant relief under the IDEA.  *L.M.*, 478 F.3d at 313.  Boggs does not demonstrate substantive harm either.  On direct examination, when asked whether he wished he could have had more orientation and mobility instruction, Boggs testified, "a little bit, but not much."  [AR, p. 639]  He further stated that he "didn't need it much."  [*Id.*]  Boggs has not alleged any deprivation of day-time orientation and mobility services with specificity, and he admitted it would not have been of much assistance.

Finally, Boggs asserts he "does not abandon the issue that the Plaintiff was denied the related services of a scribe, enlarged materials, assistive technology and braille writer which

operated to deny the Plaintiff FAPE." [Record No. 22, p. 9] But without any further elaboration from Boggs, the undersigned concurs with the hearing officer's analysis on this issue. The hearing officer determined Boggs had waived this issue because it was not included in his Complaint but, in the alternative, Boggs "ha[d] not sustained his burden of proof regarding a Scribe and/or auditory books." Further, the ECAB found that while Boggs had not mastered braille, "it was not proved [sic] that failure to instruct is the reason. An important fact to remember is that [Boggs] could still see and hear (with glasses, magnification, hearing aids, etcetera), but was being asked to learn skills that might be needed at some future date if he could not." [AR, p. 2335]

Further, the ECAB noted "[s]chool personnel testified the student could pick up ASL [("American Sign Language")] later in life if [his] hearing loss progressed sufficiently to make ASL a necessity. At the hearing, more than four years after graduating, [Boggs] testified orally, hearing and answering questions." [*Id.* at 2336] Boggs does not attempt to explain why a scribe, enlarged materials, assistive technology and braille writer were necessary. This is especially salient in light of evidence that he utilized an iPad and a laptop to read in an enlarged font. [*Id.* at 1076] On this issue, Boggs has not presented evidence "more likely than not to preclude the administrative decision from being justified based on the agency's presumed educational expertise, a fair estimate of the worth of the testimony, or both." *Ja. B.*, 61 F.4th at 502.

### B. Manifestation Determination

Boggs next argues that the hearing officer's determination that Bogg's behavior preceding his transfer to Martin Luther King was *not* a manifestation of his disability was erroneous. He contends that he was provided insufficient notice of the meeting, and that the

manifestation determination did not take into account his TBI. However, both the hearing officer and the ECAB adequately addressed these concerns after careful consideration of the record.

The procedure for manifestation determinations is outlined in Title 34 of the Code of Federal Regulations § 300.530(e). It provides, in relevant part:

> (1) Within 10 school days of any decision to change the placement of a child with a disability because of a violation of a code of student conduct, the LEA, the parent, and relevant members of the child's IEP Team (as determined by the parent and the LEA) must review all relevant information in the student's file, including the child's IEP, any teacher observations, and any relevant information provided by the parents to determine—
>
> (i) If the conduct in question was caused by, or had a direct and substantial relationship to, the child's disability; or
>
> (ii) If the conduct in question was the direct result of the LEA's failure to implement the IEP.

34 C.F.R. § 300.530(e).

Boggs was given ample notice of the hearing. Multiple notices of the hearing were sent to two of Boggs' email addresses, and his mother's email. Even accepting Bogg's allegations as true, the school could not have reasonably known that Boggs' laptop, iPad, and cell phone were all inoperable at the time, and that his mother no longer had access to her email address. Further, the school sent physical mail to Boggs' address where he lived with his parents, but the letters were not reviewed because they were not in large print, and Boggs declined to bring them to his parents. The school made straightforward and repeated attempts to notify Boggs and his parents. No procedural deficiencies existed regarding notice. [AR, pp. 220-221 and 2339-2340]

Boggs was never formally diagnosed with TBI or, if he was, no documentation was ever provided that rose to the level of a formal diagnosis. [*See id.* at 218 ("The record does not contain any evidence that links the accident to the misbehavior. The record does not contain a medical opinion on the issue. Prior to May 2018, Petitioner was generally a well-behaved student.").] In addition, Boggs had no documented disciplinary incidents between November 2015 and October 2016, which account for the first 11 months after the car accident. Further, the incident that led to Boggs' transfer to Martin Luther King occurred nearly two and a half years after the accident, with no interim behavioral issues other than the minor hallway incident in October 2016. These findings contradict claims that Boggs' voicemail threats are attributable to the 2015 car accident. Accordingly, without a TBI diagnosis, Boggs' behavior does not constitute a manifestation of that disability, and the decision to transfer him to Martin Luther King was warranted in light of his threats to staff.

Boggs argues that no consideration was given to an "integrated report" authored by school phycologist Tracie Carrico. [*See id.* at 2162.] But Boggs does not connect the May 9, 2018 incident to the report, nor does the report allege that Boggs definitively suffered a TBI. The hearing officer and the ECAB determined that, without an official TBI diagnosis, the threatening voicemail messages could not reasonably be linked to Boggs' hearing or visual disabilities. Coupled with Boggs' relatively unblemished disciplinary history, even if no consideration was given to Carrico's report, the report is not outcome determinative because it does not establish that either Boggs had a TBI diagnosis or that the incident was a manifestation of a different disability.

Finally, the case Boggs attached to his brief, *Dept. Of Educ. State of Hawaii*, 52 IDELR 58 (SEA HI 2008), is inapplicable. There, the student received no orientation and mobility

services at all. Here, Boggs received regular orientation and mobility services. In addition, the Board agreed to supplement 27 hours of night-time orientation and mobility services it agreed were missing. Boggs does not specify why additional orientation and mobility services are required, nor does he allege any substantive harm incurred.

## C. Transition Services

Boggs alleges that he was not provided with sufficient transition services, or resources to prepare him for life after school. "The lynchpin of the IDEA is a document known as the 'individualized educational program' ('IEP')." *Gibson v. Forest Hills Loc. Sch. Dist. Bd. of Educ.*, 655 F. App'x 423, 426 (6th Cir. 2016) (quoting *Honig v. Doe*, 484 U.S. 305, 311–12 (1988)). "[T]o ensure that every child with a disability is equipped with the skills and knowledge necessary to enable him to lead a productive, independent, adult life … the IDEA also requires the IEP Team to plan for the child's transition into adult life outside of the school system." *Id.* (quoting *Deal*, 392 F.3d 840, 864) (citation modified).

Requirements for transition services are defined in Title 34 of the Code of Federal Regulations § 300.43, in relevant part, as follows:

> (a) Transition services means a coordinated set of activities for a child with a disability that—
>
> (1) Is designed to be within a results-oriented process, that is focused on improving the academic and functional achievement of the child with a disability to facilitate the child's movement from school to post-school activities …
>
> (2) Is based on the individual child's needs, taking into account the child's strengths, preferences, and interests; and includes—
>
> (i) Instruction;
> (ii) Related services;
> (iii) Community experiences;

- 12 -

> (iv) The development of employment and other post-school adult living objectives; and
> (v) If appropriate, acquisition of daily living skills and provision of a functional vocational evaluation.
>
> (b) Transition services for children with disabilities may be special education, if provided as specially designed instruction, or a related service, if required to assist a child with a disability to benefit from special education.

34 CFR § 300.43.

The ECAB and the hearing officer relied heavily on Dr. Rachel Baker's testimony in determining that Boggs received adequate transition services. Baker was a witness called by Boggs who provided him with transition services. But when asked "is there anything that the ARC at Tates Creek High School should have done for transition services for Joseph that they simply failed to do[?]" she responded "No." [*See* AR 489.] Boggs contends that Baker merely connected him with community agencies rather than a tailored and specified plan based on his individual needs. The record, however, reflects that Baker (and other staff members) offered Boggs much more.

Baker testified Boggs was afforded the same transition resources as other students with visual or auditory impairments or those that were deaf-blind. [*Id.* at 210] While Baker did conduct organizational outreach, she also invited members of outside organizations to Boggs' ARC meetings and spoke with them outside the meetings. She helped Boggs complete forms that would qualify him for assistance with organizations such as the Deaf-Blind Project. [*Id.*] Further, other staff members attempted to help Boggs enroll in the Opportunity Middle College program, which would have allowed Boggs to acquire college credits as a junior or senior. [*Id.*, p. 211] However, Boggs' mother admitted that she never filled out the requisite paperwork for Boggs to participate in the program. [*Id.*, pp. 439-440]

Boggs attempts to analogize this case to *Yankton Sch. Dist. v. Schramm*, 900 F. Supp. 1182, 1186 (D.S.D. 1995). But the case is not analogous even if it were binding. *Yankton* held that a transition plan for a child with an orthopedic impairment was not reasonably calculated to enable her to receive educational benefits. But there, the school district conducted *one* meeting regarding transition services. "At that meeting, the [d]istrict provided limited information to [the student] and her parent, Angie Schramm, and, at the conclusion of the meeting, all of the participants, including the Schramms, signed a transition plan which placed nearly *all responsibility for transition planning on the Schramm family*." *Id.* at 1187 (emphasis added).

In this case, the hearing officer and the ECAB aptly weighed the evidence to conclude that Boggs received sufficient transition services specific to his individual needs. And similar to Boggs' other claims, he provides no details on how and why the transition services he received were deficient. Instead, he vaguely claims "[w]hen [he] exited MLK he was not ready to navigate his community. Denial of related services certainly hindered the Plaintiff's ability to gain employment and function in his community." [Record No. 22, p. 15] Outside of these vague assertions, Boggs has not demonstrated he was not provided "age appropriate transition assessments related to training, education, employment, and, where appropriate, independent living skills, and transition services (including courses of study) needed to assist the child in reaching those goals." *Somberg v. Utica Cmty. Schs.*, 908 F.3d 162, 171 (6th Cir. 2018) (citing 20 U.S.C. § 1414(d)(1)(A)(i)) (citation modified).

## V. Conclusion

Based on the foregoing analysis, it is hereby

- 15 -

**ORDERED** that Plaintiff Joseph Boggs' motion to overrule the Exceptional Children's Appeal Board's decision [Record No. 22] is **DENIED**. The Exceptional Children's Appeal Board's holding in favor of Defendant Board of Education of Fayette County, Kentucky is affirmed. A corresponding Judgment will be entered this date.

Dated: June 30, 2025.

Danny C. Reeves, District Judge
United States District Court
Eastern District of Kentucky